| | |
|---|---|
| DISTRICT COURT, GARFIELD COUNTY, COLORADO<br>109 8th St., Suite 104<br>Glenwood Springs, CO 81601<br>970-928-3065 | DATE FILED: May 9, 2023 12:21 PM<br>FILING ID: F07DB32FD96BD<br>CASE NUMBER: 2023CV30057 |
| **Plaintiff**: STEPHEN WORRELL AND ELISABETH K. WORRELL, AS INDIVIDUALS, AND AS TRUSTEES OF THE STEPHEN AND ELISABETH K. WORRELL TRUST;<br><br>v.<br><br>**Defendant**: THE CINCINNATI INSURANCE COMPANY | ▲   COURT USE ONLY   ▲ |
| *Attorneys for Plaintiff.*:<br>Aaron T. Berne, Esq., #50353<br>Lawrence M. Bond, Esq., #46078<br>Karp Neu Hanlon, P.C.<br>201 14th Street, Suite 200<br>P. O. Drawer 2030<br>Glenwood Springs, CO 81602<br>Tel.:(970) 945-2261<br>Fax: (970) 945-7336<br>atb@mountainlawfirm.com<br>lmb@mountainlawfirm.com | Case Number: _____ |
| **VERIFIED COMPLAINT AND JURY DEMAND** ||

Plaintiffs Stephen and Elisabeth K. Worrell, in their individual and trustee capacities (the "Worrells"), by and through their undersigned counsel of Karp Neu Hanlon, P.C., respectfully submit this Verified Complaint and Jury Demand, and state as follows:

### NATURE OF THE ACTION

1. This action is brought to adjudicate the Worrells' claims against the Cincinnati Insurance Company ("Cincinnati") based on Cincinnati's partial denial of coverage under the "Executive Capstone$^{TM}$ Homeowner" insurance policy the Worrells purchased to protect their home from fire and damage.

2. The Worrells seek to recover payment and damages from Cincinnati for its partial denial of coverage and unreasonable delay of benefits under the parties' insurance contract, following a catastrophic fire that damaged the Worrells' home.

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 2 of 20

## THE PARTIES AND THE PROPERTY

3. Plaintiffs Worrells are the owners of the real property and improvements located in Garfield County at 501 Maple Street, Glenwood Springs, Colorado (the "Property").

4. Upon information and belief, Defendant, The Cincinnati Insurance Company ("Cincinnati"), is incorporated under the laws of the State of Ohio with a principal place of business in Cincinnati, Ohio, and is authorized to do business and is doing business in the State of Colorado.

5. At all times pertinent hereto, Cincinnati was conducting the business of insurance in Colorado by, *inter alia*, insuring the real property owned by the Worrells.

## JURISDICTION AND VENUE

6. Personal and Subject Matter Jurisdiction is proper in this Court due to Cincinnati's transaction of business in Colorado pursuant to Colorado's general jurisdiction and long arm statutes found at C.R.S. § 13-1-124 and the Colorado Constitution, Article 6, Section 9. In addition, Defendant, as a legal entity registered with the Colorado Secretary of State, is subject to jurisdiction in Colorado, and this Court has personal and subject matter jurisdiction over the parties and claims in this matter due to the relevant contracts which were entered into and to be performed in Garfield County, Colorado.

7. Venue is proper in Garfield County pursuant to Rule 98(c) of the Colorado Rules of Civil Procedure, because this dispute involves events that occurred in Garfield County, and because the real property at issue is situated in Garfield County, Colorado.

## GENERAL ALLEGATIONS

**A. The Property:**

8. The "Property" at issue in this case is located in Garfield County, Colorado at 501 Maple Street, Glenwood Springs, Colorado.

9. During the time period of the fire at issue in this case, the Property was owned by Plaintiffs Stephen Worrell and Elisabeth Worrell. **Exhibit A - Worrell Deed of Ownership**.

10. As of the date of filing this complaint, the Property is now owned by the Stephen Worrell and Elisabeth K. Worrell Trust, with Stephen and Elisabeth K. Worrell as the settlors, trustees, and current beneficiaries. **Exhibit B - Trust Deed of Ownership**.

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 3 of 20

### B. The Insurance Policy:

11. Cincinnati issued a policy of insurance to the Worrells for an "Executive Capstone™ Policy," which provided insurance coverage for the Property, under policy number H020893920 (the "Policy"). **Exhibit C - Executive Capstone™ Policy**.

12. Plaintiff Stephen and Elisabeth Worrell are the named insured on the Policy.

13. The relevant Policy Period was from January 22, 2019 through January 22, 2020 (note, additional periods were extended).

14. Cincinnati's Executive Capstone™ program represents that it "covers the full cost to rebuild your home… and uses professionals to help establish the cost to reconstruct your home with all its special features."[1] **Exhibit D - Executive Capstone™ Website** (emphasis added).

15. Cincinnati represents that, based on its "financial strength, stability and ethical approach to claims, we will be there to help you recover financially after a covered loss."[2] **Exhibit D - Executive Capstone™ Website** (emphasis added).

16. The Worrells relied on Cincinnati's representations, as well as the "capstone coverage" and "complete replacement cost" in the Policy, as materially important when agreeing to purchase the Policy and when paying the higher premiums for the Executive Capstone™ additional coverage.

17. The Policy coverage and limits of insurance are $431,000 for the dwelling. **Exhibit C, Executive Capstone™ Policy, Declarations, p. 2 of 3.**

18. The Policy coverage and limits of insurance are $68,342 for other structures. **Exhibit C, Executive Capstone™ Policy, Declarations, p. 2 of 3**.

19. The coverage amounts for the dwelling and the other structures are collectively referred to as the "Policy Limits." **Exhibit C, Executive Capstone™ Policy, Declarations, p. 2 of 3**.

20. The Policy covered all risks of loss except for risks that were expressly and specifically excluded.

21. The Policy specifically covers losses as a result of fire. **Exhibit C, Executive Capstone™ Policy, p. 7 of 44, ¶ 41**.

---

[1] *See* Cincinnati Insurance Companies, Executive Capstone, April 15, 2023, https://www.cinfin.com/personal-insurance/private-client/executive-capstone-home.
[2] *Id.*

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
***Verified Complaint***
Page 4 of 20

22. The Policy Limits are eligible for increased, or additional, compensation beyond the Policy Limits as set forth in the Policy, as "Additional Coverage."

23. The Additional Coverage provides for coverage and payment that exceeds the Policy's cap's listed in the Declarations.

24. Specifically, the Additional Coverage increases the Policy Limits by specific provisions contained under Section I.A.5 of the Policy.

25. Additional Coverage provisions above the Policy Limits are included, without limitation, for the following:

26. "**Debris Removal**" per the Policy provision Section I.A.5.a., reads as follows:

> (1) "We" will pay "your" reasonable expense to remove:
>
> (a) Debris of Covered Property . . ."

27. "**Land Restoration**" per the Policy provision Section I.A.5.c., reads as follows:

> "We" will pay up to the greater of $10,000 or 10% of a Covered Cause of Loss to the "residence premises" for costs required to replace, rebuild, stabilize, excavate or restore the land necessary to support the "residence premises" . . .

28. "**Ordinance or Law**" per the Policy provision Section I.A.5.k., reads as follows:

> "After a covered loss, "we" will pay for the increased costs "you" incur caused by the enforcement of any ordinance or law which requires or regulates:
>
> > "(a) The construction, demolition, remodeling, renovation or repair of the damaged part of a covered building or other structure made necessary by a Covered Cause of Loss;
> >
> > "(b) The remodeling, replacement or removal of the portion of the undamaged part of covered building or other structure necessary to complete the remodeling, replacement or removal of that part of the building or other structure damaged by a Covered Cause of Loss; or
> >
> > "(c) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 5 of 20

Covered Cause of Loss to another part of that covered building or other structure.

29. "**Guaranteed Replacement Cost Protection**" per the Policy provision Section I.A.5.t. *See* **Exhibit C – the Policy** for the full policy regarding Guaranteed Replacement Cost Protection, e.g.: pg. 18-19.

30. The costs of rebuilding the Property may, therefore, exceed the Policy Limits if certain repairs fall under the Additional Coverage provisions of the Policy. **Exhibit C - the Policy**.

31. The Worrells have timely and fully paid all their premiums for the Policy.

32. The Worrells have timely and fully provided all requisite information to Cincinnati.

33. The Worrells have timely and fully performed all of their obligations under the Policy.

34. The Worrells have complied with all conditions precedent to coverage under the Policy and/or such conditions have been waived, released, prevented, or excused by Cincinnati's unreasonable conduct and/or breach of the Policy.

**C.  The Fire and Damage:**

35. The Property was originally constructed in approximately 1940.

36. The Property consists of a single-family home with a finished basement.

37. The Property consists of approximately 1,115 square feet of living area on the main level, and an additional approximately 916 square feet on the basement level, for a total square footage of approximately 2,032.

38. The Property includes a single car garage directly behind the home at the rear of the property.

39. In 2019, the Worrells' daughter, Lisa Dickson, was living at the residence on the Property.

40. On October 25, 2019, a house fire occurred at the Property (the "Fire"). **Exhibit E - Post Independent Newspaper Article**.

41. The Worrrell's daughter (Ms. Dickson) and her dog were asleep in the home when the fire occurred.

42. Ms. Dickson was severely injured from falling down the stairs while attempting to escape the fire-engulfed home, leaving her unconscious and severely harmed by smoke inhalation.

43. Ms. Dickson was rescued from the interior of the home by emergency response personnel, and thankfully she survived after treatment at the UCHealth Burn and Frostbite Center - Anschutz Medical Campus, in Denver, Colorado.

44. Tragically, Ms. Dickson's dog perished in the Fire.

45. The Fire's damage to the Property was catastrophic.

46. The Fire and smoke nearly took the life of Worrell's daughter.

47. The Fire and smoke took the life of Ms. Dickson's dog.

48. The Fire, severe smoke, and water damage permeated the entire home, damaging the Property and the Worrell's and Ms. Dickson's personal belongings; and very little was salvaged from the Property.

### D. The Claim and Project after the Fire.

49. After the Fire, the Worrells started working on how to repair and replace the Property and their personal possessions that were damaged and lost in the Fire.

50. On or about November 6, 2019, the Worrells timely tendered notice of the occurrence and the loss under the Policy to Cincinnati for coverage of the Fire and related damages the Worrells' Property sustained (the "Claim").

51. The Worrells' notice of the Claim to Cincinnati was timely.

52. The timing of the Worrell's notice resulted in <u>no</u> prejudice to Cincinnati.

53. As a result of the Fire, severe smoke, and water damage, the Property needed to be rebuilt and repaired (the "Project").

54. Cincinnati responded to the Worrells Claim by retaining RMC Group, L.L.C., a Kansas limited liability company, with a mailing address of 13725 South Mur-Len Road, Olathe, KS 66062 ("RMC"), and sending RMC to investigate the Fire and give costs estimates for the insurance coverage adjusters.

55. On December 3, 2019, Cincinnati's representative, Glen Heide ("Heide") sent the Worrells a letter and RMC's Darren Leins' cost estimate for the damages at the Property. **Exhibit F - December 3, 2019 Letter**.

56. RMC originally estimated that the building loss and the cost of the rebuild was $182,111.48 to rebuild the Property, or $89.61 per square foot. **Exhibit F- December 3, 2019 Letter**.

57. On December 4, 2019, Cincinnati issued a $182,111.48 payment to the Worrells.

58. On or about December 31, 2019, the Worrells entered into an agreement with a local contractor, HB, Inc. (hereafter as "HB"), to perform the Project.

59. On December 30, 2019, before completion of plans and specifications, HB provided an initial estimate for the Project. HB initially estimated $304,968.18 to perform the Project, subject to change orders and increases for additional scope of work after completion of the plans and specifications.

60. HB's December 20, 2019 estimate did not include the full scope required and necessitated to complete the Project.

61. Commencing early 2020 through approximately March 13, 2020, HB performed major demolition and cleaning work.

62. Starting in mid-March 2020 the COVID-19 closures seriously limited the amount of work that HB could perform for the Project, particularly because the Glenwood Springs Building Department was still closed for in-person submittal of the plans and application of a Building Permit through August 2021.

63. During this seventeen-month period of March 2020 through August 2021, the Project was restricted from moving forward due to COVID-19, which was beyond the Worrell's control, as explained in more detail under *Section E*, below.

64. On April 15, 2021, RMC issued a supplemental estimate for additional work on the Property, in the amount of $41,767.04. **Exhibit G - April 15, 2021 Supplemental Estimate**.

65. On April 16, 2021, Cincinnati issued a supplemental payment of $41,767.04 to the Worrells.

66. In September 2021, the Worrells changed contractors from HB to McCullough CO, LLC ("McCullough"), and McCullough commenced its work shortly thereafter.

67. At this same time in September 2021, the City of Glenwood Springs started re-opening its doors for in-person submittals of plans and applications for building permits.

68. On September 9, 2021, Cincinnati's Heide, said "Cincinnati Insurance will be closing this file on October 25, 2021… if there is no new information received." **Exhibit H - September 9, 2021 Closing Letter**.

69. At this time in September 2021, the Project was still ongoing and incomplete, and the Worrells were still submitting additional information to Cincinnati for coverage of the Claim.

70. On October 5, 2021, McCullough's first act as general contractor was to meet with RMC's new representative, Darren Bautista ("Bautista"), to review the Project.

71. Beginning October 15, 2021 and throughout the Project, McCullough regularly invoiced the Worrells bi-weekly.

72. As of April 2022, McCullough completed the Project.

73. In April 2022, the City of Glenwood Springs issued the certificate of occupancy for the finished Project at the Property.

74. On May 17, 2022, the Worrells asked Cincinnati for full coverage of their Claim and sent Cincinnati's representative, Heide, McCullough's final invoice for the Project.

75. The Worrells timely submitted all the HB Invoices (constituting 10 invoices, between the dates of 12/17/2019 – 8/17/2021) and the McCullough Invoices (constituting 14 invoices, between the dates of 10/15/2021 – 5/1/2022) to Cincinnati for coverage of the Claim.

76. On May 23, 2022, Heide responded by letter to the Worrells, and Heide stated that numerous expenses were not covered by Cincinnati and stated that "[o]nly the items on RMC's original scope are covered in this loss." **Exhibit I - May 23, 2022 Heide Letter**.

77. It was upon receiving this May 23, 2022 letter from Heide, that the Worrells first learned Cincinnati was denying coverage of their Claim.

78. As a result of learning of Cincinnati's denial, the Worrells retained the law firm of Karp Neu Hanlon, P.C.

79. On July 21, 2022, the Worrells, through counsel, sent a letter to Cincinnati requesting that Cincinnati reconsider its denial of full coverage of the Claim. **Exhibit J - July 21, 2022 Demand for Coverage Letter**.

80. On August 3, 2022, the Worrells, through counsel, also sent to Cincinnati 106 pages of supporting documentation for the Claim (much of which had previously been provided by the Worrells to Cincinnati).

81. On September 6, 2022, Cincinnati issued its first official denial of coverage and made its first request for information pursuant to C.R.S. § 10-3-1118(1)(c). **Exhibit K - September 6, 2022 Letter**.

82. Cincinnati's September 6, 2022 letter and the request for information is vague and insufficiently detailed.

83. Cincinnati's September 6, 2022 letter improperly requests the building permit, building department file, codes, ordinances, and applicable laws, as they are publicly available information and are available to Cincinnati without the assistance of the Worrells (*see, e.g.*: C.R.S. §10-3-1118(1)(b)).

84. On October 20, 2022, the Worrells, through counsel, notified Cincinnati of its failure to perform its duty to provide clear and itemized denials that would allow the Worrells to fully respond to the denials. **Exhibit L - October 20, 2022 Letter to Cincinnati**.

85. The Worrells' October 20, 2022 letter requested that Cincinnati identify the specific items in the Worrells' Claim that are being denied and the specific basis/explanation for each item that is being denied. **Exhibit L - October 20, 2022 Letter to Cincinnati**

86. The Worrells also requested that Cincinnati provide RMC's full file for the project, including pictures and notes, to help us better understand how Cincinnati arrived at their denial. **Exhibit L - October 20, 2022 Letter to Cincinnati**.

87. On November 2, 2022, after receiving no response from Cincinnati, the Worrells, through counsel, emailed Cincinnati to follow up on the October 20, 2022 letter.

88. On November 5, 2022, still with no response from Cincinnati, the Worrells, through counsel, sent another letter with a coverage request and supporting information to Cincinnati. **Exhibit M - November 5, 2022 Letter to Cincinnati**.

89. Except for the follow-up site inspection performed by Cincinnati on March 16, 2023, Cincinnati has not performed any further investigation or provided any further response with respect to the Worrells' Claim.

E. **The Effects of the COVID-19 Pandemic**

90. With the sudden and tragic Fire occurring on October 25, 2019, it was only a few months before the COVID-19 pandemic caused lockdowns and stay at home orders.

91. The Court may take judicial notice of the widespread and significant effects of the COVID-19 pandemic on the construction industry in Colorado during the relevant time period, such as:

Case No. 1:23-cv-01512-CNS-NRN   Document 3   filed 06/15/23   USDC Colorado   pg 10 of 20

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 10 of 20

    a. On March 11, 2020, the World Health Organization declared that COVID-19 constituted a global pandemic.

    b. Efforts to prevent exposure to COVID-19 caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes (the "Closure Orders").

    c. These Closure Orders in Colorado began on March 16, 2020, and included, but were not limited to the Colorado Public Health Order implementing stay at home requirements, ordering nonessential businesses to close and for personnel to stay at home whenever possible, and to implement extreme social distancing.[3]

    d. COVID-19 Closure Orders caused closures, labor shortages, building and construction supply shortages, as manufacturers at home and abroad, either closed completely, as they were not deemed "essential businesses" by their local governments or reduced their staffing and capacity to help support social distancing efforts among employees.

    e. COVID-19 caused supply chain delays that severely impacted the construction industry and persisted for several years, which increased costs of goods and caused delays.[4]

    f. As a result of COVID-19, construction costs dramatically increased, caused delays to government offices, and exacerbated the tight and difficult labor market in Glenwood Spring and surrounding communities.

**F. Project Scope and Code Requirements**

92. During the architectural design phase and permitting process for the Project, it was determined that to meet compliance with the 2015 International Existing Building Code Section 505, which had been adopted by the City of Glenwood Springs Building Department, additional work and costs were required to comply with the City of Glenwood Springs' code ("Code Requirements").

93. Mandatory Code Requirements included, but were not limited to, the following required changes:

---

[3] On March 18, 2020, Governor Polis issued an executive order closing Colorado schools to in-person learning and ordered online instruction. These mandated closures affected the City of Glenwood Springs Building Department and other businesses, such as architectural firms and construction companies.

[4] *See, e.g.*, https://www.postindependent.com/news/what-garfield-county-contractors-deal-with-while-hammering-their-way-through-covid-19/

94. <u>Concrete Staircase</u>.  The 80-year-old concrete staircase in the home had to be replaced due to Code Requirements and severe fire, smoke, and water damage. The existing concrete staircase did not meet Code Requirements and had to be removed in order to meet Code Requirements.  To meet Code Requirements the Worrells had to conduct the following work:

   a. Removal, excavation, and demolition of the concrete existing staircase.

   b. The Property backdoor had to be altered with the change in the staircase location, because the original landing was not in compliance with Code Requirements.

   c. A new access to the outside had to be modified to provide for the relative elevation of the door to the Code Requirements for the exterior landing, thus a small deck was created.

   d. The Property's window placement was altered due to the modified door replacement.

   e. Construction of a new staircase that was compliant with the Code Requirements.

95. <u>Window Wells</u>.  Installation of window wells and window openings in the basement for emergency egress was required to meet Code Requirements.

96. <u>Window Replacement</u>.  The original windows did not comply with the 1995 energy code requirements and/or were damaged in the fire, and new windows were required throughout the home.

   a. Replacement of the original custom windows with new standard sized windows, which required reframing the window openings, was <u>more cost effective</u> than purchasing and installing custom made windows to match the historic existing custom sized window frames throughout the home. As a result, the 1940s exterior siding had to be replaced in connection with the reframing to match the use of standard stock purchased windows.

97. <u>Insulation</u>.  Spray foam insulation was required to achieve the required R-Value insulation.

98. <u>Wiring</u>.  The entire electrical system needed to be replaced and brought up to meet the Code Requirements, including the addition of wired smoke alarms. Also, the electrical service to the garage and its wiring had to be brought up to comply with Code Requirement standards so it could be tied into the electrical panel in the house.

99. <u>HVAC</u>. Installing a heating and ventilation system at the Property was also a necessary part of the Project, as heating and ventilation sources are essential components to a home in Colorado's mountain climates.

   a. The original historic heating system at the Property was an obsolete steam boiler and radiator system that originally used coal for its fuel, that was later converted to a natural gas powered radiator system. The radiators were built into recesses in the walls. The heating system and radiators were severely damaged by the Fire, smoke, and water. This antiquated system was no longer available, not replaceable, and the system no longer met current Code Requirements.

   b. The replacement of the heating system with a new Mini-Split energy-efficient system complied with energy requirements and was <u>more cost effective</u> than custom building the historic and obsolete 1940s era radiator system.

   c. The installation of heating and ventilation at the Property was required by Code Requirements.

   d. The Worrells installation of a Mini-Split energy-efficient system that provided the benefit of both heating and cooling was a cost-effective alternative to replicating the original historic heating system, which consisted of an obsolete radiator system that could not be replicated and was not energy efficient.

100. Mandatory work on the Project as a result of Code Requirements were not included in RMC's estimated replacement cost, and during the course of the Project through present, Cincinnati has wrongfully denied coverage.

101. The costs of the Project were reasonable and within normal market rates.

102. The Project had only *de minimis* duplicative work (e.g.: mobilization) when the Worrells switched from HB to McCullough.

103. The scope of the Project and coverage for the Claim is more particularly detailed in the initial Expert Report prepared by Demand Construction Services, Inc.'s ("Demand") Robert Pratt, who is a Forensic Fire Damages Expert. **Exhibit N - Demand's Initial Expert Report**.

### G. Cincinnati's Failure to Investigate and Denials of Claims:

104. Without even reviewing and considering all the invoices the Worrells submitted for their Claim, Cincinnati unreasonably adhered to its original 2019 estimate, only paid $223,878.52[5] for the Claim, and denied all further amounts of the Claim.

105. Cincinnati, through RMC, issued a cost tracking spreadsheet, which purportedly demonstrates how RMC tracked the Worrells' invoices and how RMC determined which invoice amounts were within the scope of RMC's original and supplementary estimates. **Exhibit O - RMC Spreadsheet**.[6]

106. RMC's Spreadsheet shows Cincinnati took into consideration only the HB invoices and only the first 12 of the 14 McCullough invoices. **Exhibit O - RMC Spreadsheet**.

107. Cincinnati only considered RMC's original and supplemental estimate of $223,878.52 (or $110.18 per square foot) when Cincinnati decided to deny the remainder of the Worrells' Claim.

108. Cincinnati unreasonably denied coverage on more than half of the work performed by McCullough on the Project. **Exhibit O - RMC Spreadsheet**.

109. Cincinnati failed or refused to update RMC's 2019 and 2021 cost estimates for the Project.

110. Cincinnati is relying on the old and outdated analysis from RMC Group.

111. Cincinnati is refusing to acknowledge the effects of the COVID-19 pandemic.

112. Cincinnati failed or refused to update its scope of coverage for the Project to reflect the Code Requirements and other covered work.

113. Cincinnati failed or refused to properly investigate the Claim with regard to the Code Requirements mandated by the City of Glenwood Springs.

114. Cincinnati used agents from out of state and out of region (i.e.: RMC), who have no understanding of the Roaring Fork Valley market.

115. Cincinnati failed or refused to properly investigate the costs of construction in the Roaring Fork Valley market.

---

[5] Note, $39,272.35 less than what RMC calculated related to RMC's "limited scope," which doesn't consider the entire scope of the Project for the Claim.
[6] Note, RMC spreadsheet does not include the final two invoices from McCullough, Invoices number 13 and 14.

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
***Verified Complaint***
Page 14 of 20

---

116. Cincinnati failed or refused to provide the requisite information to the Worrells as to why their Claim was not fully paid.

117. Cincinnati unreasonably denied full payment of the Worrells' Claim.

118. Cincinnati's failures, refusals, and denials are unreasonable and bad faith.

119. Cincinnati's conduct fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of insurance contract.

120. Cincinnati's acts and omissions were unreasonable, and Cincinnati knew so, and/or Cincinnati acted with reckless disregard for the Worrells' rights and interests.

121. Cincinnati's acts and omissions were committed in disregard of the Worrells' reasonable expectations as an insured under the Policy.

122. The total amount of the Claim covered by the Policy will be proven at trial, but is in no event less than $475,923.96.

123. As of the date of this Verified Complaint, Cincinnati has only paid a total of $223,878.52 of the Worrell's Claim.

124. The total amount the Worrells have been damaged as a result of Cincinnati's denial of full payment of the Claim will be proven at trial, but is in no event less than $252,045.44.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

125. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

126. The Policy is a valid and enforceable contract of insurance (see e.g., ¶¶ 11 and 12, above).

127. Cincinnati's acts and omissions as described in this Complaint constitute a breach of the Policy, including without limitation, Cincinnati's failure to perform its agreement to pay the Worrells' full Claim and its failure to pay benefits owed to the Worrells under the Policy (see e.g., ¶¶ 49-88 and 104-123, above).

128. The Worrells, at all relevant times, substantially performed all their obligations as required under the Policy (see e.g., ¶¶ 31, 32, 33, and 34 above).

Case No. 1:23-cv-01512-CNS-NRN   Document 3   filed 06/15/23   USDC Colorado   pg 15 of 20

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 15 of 20

129. There were no events or circumstances that through notice or passage of time, or both, would constitute a default by the Worrells or otherwise relieve Cincinnati of its' obligations to perform under the Policy.

130. Any and all conditions precedent to the commencement of this action have been fulfilled or excused, including but not limited to demand for payment and notice of intent to file.

131. As a direct and proximate result of Cincinnati's material, substantial, and bad faith breaches of the Policy, the Worrells have suffered damages and are entitled to recover those damages from Cincinnati in an amount to be determined at trial, including without limitation the amount of the benefits owed and/or wrongfully withheld under the Policy, and in no event less than $252,045.44, plus fees, pre-trial and post-trial interest at the highest rate allowed by contract or law, attorneys' fees, costs, and additional relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

132. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

133. Under the Policy's implied covenant of good faith and fair dealing, Cincinnati promised that it would deal with the Worrells fairly and honestly, and do nothing to impair, hinder, or injure the Worrells' rights to benefits under the Policy.

134. Through the acts and omissions described above, Cincinnati breached that covenant of good faith and fair dealing (*see e.g.*, ¶¶ 49-88 and 104-123, above), including without limitation:

    a. Depriving the Worrells of the benefits and protections of the Policy;

    b. Placing its own interests above those of the Worrells;

    c. Failing to timely pay benefits owed under the Policy;

    d. Misrepresenting facts concerning the Policy's coverage;

    e. Failing to conduct a reasonable and impartial investigation of the loss based upon all available information;

    f. Forcing the Worrells to bring a lawsuit to recover benefits owed and protections guaranteed under the Policy;

    g. Violating the Unfair Claims Settlement Practices Act; and

   h. Other conduct to be discovered in the course of these proceedings.

  135. Cincinnati's conduct fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of insurance contract.

  136. Cincinnati's acts and omissions were unreasonable and Cincinnati knew so, and/or Cincinnati acted with reckless disregard for the Worrells' rights and interests.

  137. Cincinnati's acts and omissions were committed in disregard of the Worrells' reasonable expectations as an insured under the Policy.

  138. As a direct and proximate result of Cincinnati's material, substantial, and bad faith breaches of the Policy, the Worrells have suffered damages and are entitled to recover those damages from Cincinnati in an amount to be determined at trial, but in no event less than $252,045.44, plus fees, pre-trial and post-trial interest at the highest rate allowed by contract or law, attorneys' fees, costs, and additional relief as the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### (Violation of C.R.S. § 10-3-1115 and Claim for Relief Under § 10-3-1116)

  139. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

  140. Colorado's insurance bad faith statute, C.R.S. § 10-3-1115(1) and (2), forbids insurers, such as Cincinnati, from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

  141. The Worrells are first-party claimants as that term is used under C.R.S. § 10-3-1115(1)(b)(I).

  142. Cincinnati is an entity engaged in the business of insurance.

  143. Cincinnati delayed and/or denied payment of first-party benefits owed to the Worrells and did so without a reasonable basis within the meaning of C.R.S. § 10-3-1115(2) for the reasons set forth above.

  144. C.R.S. § 10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action to recover reasonable attorneys' fees and court costs and two times the covered benefit that was unreasonably delayed or denied.

  145. As described herein, Cincinnati's acts and omissions violated C.R.S. § 10-3-1115(2).

146. The Worrells therefore bring this claim to recover damages awardable under C.R.S. § 10-3-1116, separate from and in addition to those remedies and damages available under any other applicable claims for relief.

### FOURTH CLAIM FOR RELIEF
(**Declaratory Judgment**)

147. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

148. The Policy is a contract under which the Worrells paid Cincinnati substantial premiums in exchange for Cincinnati's promise to pay the Worrell's claims for losses covered by the Policy.

149. The Worrells have complied with all applicable provisions of the Policy and/or those provisions have been waived by Cincinnati, but Cincinnati has vitiated its obligations toward the Worrells pursuant to the Policy's terms.

150. An actual case or controversy exists regarding the Worrell's rights and Cincinnati's obligations under the Policy to provide benefits and coverage for the losses incurred by the Worrells in connection with the Fire at the Worrells' Property and the Worrells' Claim.

151. Pursuant to C.R.C.P. 57, the Worrells seeks a declaratory judgment from the Court declaring the following:

   a. That the Worrells' losses incurred related to the Fire are insured losses under the Policy; and

   b. Cincinnati is obligated to pay the Worrells for the full amount of the losses they have incurred related to the Fire.

**WHEREFORE**, Plaintiffs, the Worrells, request the Court enter judgment in their favor and against Defendant, The Cincinnati Insurance Company, and award damages as follows:

   c. For all benefits due under the Policy for covered losses;

   d. For other actual and compensatory economic damages in amounts to be proven at trial;

   e. For two-times the covered benefit as permitted by C.R.S. § 10-3-1116(1);

   f. For reasonable attorneys' fees, costs, and expenses incurred herein;

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 18 of 20

    g.  For all pre- and post-judgment interest, as permitted by contract or law;

    h.  For a declaratory judgment as set forth above; and

    i.  For such other and further relief as the law permits and this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims so triable.

## C.R.C.P. 16 CERTIFICATION

Pursuant to Colorado Rules of Civil Procedure 16 and 16.1, this Complaint involves Plaintiff Worrells seeking monetary judgment from Defendant Cincinnati of more than $100,000 (exclusive of interest and costs), and this Complaint is filed under Rule 16.

## RESERVATION OF RIGHTS; INCORPORATED EXHIBITS

Plaintiffs, the Worrells, reserve the right to amend this Verified Complaint. All exhibits referenced in and filed with this Verified Complaint are incorporated by this reference.

*{verification on following page, remainder of this page intentionally blank}*

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 19 of 20

## VERIFICATION

STATE OF COLORADO    )
COUNTY OF Garfield    ) ss.

I, **Stephen Worrell**, after being duly sworn upon oath, state that the information contained in the Verified Complaint is true and correct.

_____
Stephen Worrell

Subscribed and sworn to before me this May 8, 2023, by **Stephen Worrell**.

_____
Notary Public
My commission expires 1/24/2023.

> Angelique Petterson
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID# 20114003802
> MY COMMISSION EXPIRES 1/24/2027

STATE OF COLORADO    )
COUNTY OF Garfield    ) ss.

I, **Elisabeth K. Worrell**, after being duly sworn upon oath, state that the information contained in the Verified Complaint is true and correct.

_____
Elisabeth K. Worrell

Subscribed and sworn to before me this May 8, 2023, by **Elisabeth K. Worrell**.

_____
Notary Public
My commission expires 1/24/2023.

> Angelique Petterson
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID# 20114003802
> MY COMMISSION EXPIRES 1/24/2027

Garfield County District Court Case No. _____
*Worrell v. Cincinnati*
**Verified Complaint**
Page 20 of 20

Submitted By:

           *Attorneys for Plaintiff Worrells*
           KARP NEU HANLON, P.C.
           By: /s/*Aaron T. Berne*, Submitted On: May 9, 2023
               Aaron T. Berne, Esq., #50353

Plaintiff's Address:
c/o Karp Neu Hanlon, P.C.
P.O. Drawer 2030
Glenwood Springs, CO 81611